**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JANELL SALGADO, | ) | |
| | ) | 08 C 2878 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Gottschall |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | Magistrate Judge Mason |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S MOTION TO DISMISS
PORTIONS OF COUNTS III AND IV OF PLAINTIFF'S COMPLAINT**

Defendant City of Chicago ("City"), by its attorney, Mara S. Georges, Corporation Counsel, respectfully moves this Court to dismiss portions of Plaintiff's Complaint, specifically allegations against it in Counts III and IV, pursuant to Fed. R. Civ. Pro. 12(b)(6), and in support states:

### I.    Introduction

Plaintiff, as administrator of the estate of Victor Flores, Jr. ("Flores"), brings a four-count complaint against the City and three currently unnamed Chicago Police Officers alleging both federal and Illinois state law claims that arise from Flores' death while in police custody.  In Court I, Plaintiff brings a claim against currently unnamed employees (identified in the complaint as John, James and Mary Doe) for violations of Section 1983 in their alleged failure to provide Flores with adequate medical care.  Count II is directed against the City, and alleges that Flores' injuries occurred pursuant to the policies and practices of the City.  Similarly, the Illinois state law claims brought in Counts III and IV are directed solely against the City.  However, large portions of those claims should be dismissed pursuant to the Illinois Local Governmental and Governmental Employees' Tort Immunity Act ("Tort Immunity Act") because the City is immunized from state common law claims based on acts of discretion or policy.

## II.    Factual Allegations

For purposes of this Motion, City takes as true the following well-pleaded allegations of the complaint: On June 28, 2007, Flores was taken into custody by Chicago Police Officers pursuant to an arrest warrant issued by the Chicago Police Department ("CPD").  (see Complaint ¶¶ 5, 6, 12). Prior to be taken into custody, the officers were informed – either by an alert from the CPD or by another law enforcement agency –  that Victor was "suicidal and/or had a serious mental health condition."  (Id. at ¶¶ 7, 8).  The arresting officers were also advised by Victor himself and other friends and family members at the scene that Victor was suicidal.  (Id. at ¶¶ 9, 10).  The arresting officers relayed this information to a supervisor and other CPD employees at the station where Victor was transported, and where he later died.  (Id. at ¶¶ 15, 16, 17).

## III.    Legal Standards

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), all well-pleaded allegations in the complaint will be accepted as true.  *White v. City of Markham*, 310 F.3d 989, 992 (7th Cir. 2002).  However, if the plaintiff cannot prove any set of facts upon which relief could be granted, dismissal is proper.  *See Cleveland v. Rotman*, 297 F.3d 569, 571 (7th Cir. 2002).  A court is "not required 'to ignore any facts set forth in the complaint that undermine the plaintiff's claim or assign any weight to unsupported conclusions of law.'" *City National Bank of Florida v. Checkers, Simon & Rosner*, 32 F.3d 277, 281 (7th Cir. 1994) (citations omitted).  Where a plaintiff pleads sufficient facts to establish that he cannot recover on his claims, the Court should dismiss those claims. *Jackson v. Marion County*, 66 F.3d 151, 153-4 (7th Cir. 1995).

### IV.    Argument

Count III of Plaintiff's claim is brought under the Illinois Survival Act, and alleges that the City, through currently unnamed employees (identified in the complaint as John, James and Mary Doe), is liable pursuant to the doctrine of *respondeat superior* for these employees' "willful and wanton acts and omissions" which led to Flores' death while in CPD custody. The same allegations are incorporated in Count IV, brought under the Illinois Wrongful Death Act. While the City may be liable under the doctrine of *respondeat superior* for the acts of its employees, the Illinois Tort Immunity Act specifically immunizes the City from any injury resulting from an act of policy or discretion, either on its own part or its employees. Therefore, any claims alleging injury based on policy or discretionary acts involving the City or its employees must be dismissed.

In the instant case, the vast majority of Plaintiff's claims in Count III (and by adoption Count IV) are based on either an unnamed officer's discretionary acts or the policies and practices of the City. Specifically, in paragraph 41 the claims brought against the as yet unnamed officers in subparts b) c), d), e), f), h) and (i) involve those officer's discretionary acts. Subparts j) through n) allege that Plaintiff's damages were caused by the City's alleged customs and practices, or a failure to implement certain customs and policies, and subparts o) through q) allege that the City failed to train its officers or "failed to ensure" its officers followed the City's policies and practices regarding, *inter alia*, the mental health needs of arrestees. *See* Compliant, attached as exhibit A. Not only should these subparts be stricken because they are duplicative of the claims brought against the City pursuant to Section 1983 in Count II, these allegations are based on supposed municipal policies and practices, and the City is immune from these claims.

Section 2-201 of the Tort Immunity Act states, "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (2007). This principle is extended to municipalities themselves through Section 2-109 of the Tort Immunity Act, which provides there is no municipality liability where the employee is not liable. 745 ILCS 10/2-109 (2007); *see also Zinnermon v. City*, 209 F. Supp.2d 980, 911 (N.D. Ill 2002), *Hartman v. Lisle Park District*, 158 F.Supp.2d 869, 877 (N.D.Ill.2001), *Reed v. City of Chicago*, 2002 WL 406983 at 2 (N.D. Ill. 2002) (Moran, J.). Courts in this circuit have held that allegations brought under state law regarding municipal practices – including training and implementing customs and practices – are an act of discretion and policy therefore the City is immunized by the Tort Immunity Act. *See Hartman*, 158 F.Supp at 877; *see also Eruteya v. City*, 2005 WL 563213 at 7 (N.D. Ill. 2005) (Coar, J.) (a city generally receives immunity for its acts of policy).

For example, in *Reed v. City of Chicago*, Plaintiff alleged facts strikingly similar to those alleged here: Plaintiff's son hung himself while in police custody, and the City's employees were aware of the decedent's mental instability and suicidal tendencies but did not take action to stop him from harming himself. *Reed v. City of Chicago*, 2002 WL 406983 at 1. Plaintiff's state law claim was brought solely against the City for negligent training, supervision and hiring of Chicago Police Officers, and the City moved to dismiss this claim pursuant to the Tort Immunity Act. *Id.* at 2. Judge Moran agreed with the City, holding that allegations related to the hiring and training of police officers were of both an exercise of policy and discretion, and thus the City was immune. *Id.* at 3.

Plaintiff brings similar claims in the instant case. Specifically, paragraph 41, subparts o), p) and q) assert that the City "failed to train" (o) and "failed to ensure" (p, q) its officers regarding, *inter alia*, suicide awareness, pretrial detainees, and mental health conditions. These allegations are explicitly regarding the City's policies and discretionary acts, and the City is therefore immune from these claims. Similarly, Plaintiff's claims in subparts j) through n) of paragraph 41 allege that Plaintiff's damages were caused by the City's alleged customs and practices. These subparts should be dismissed not only because the City is immune from such claims regarding its policies under state law, but they are redundant because Plaintiff has brought a nearly identical claim under Section 1983 claim against the City in count II.

Additionally, the claims brought against the as yet unnamed officers in subparts b) c), d), e), f), h) and (i) involve those officer's discretionary acts. For example, the decision to place the decedent in a particular cell or detention area, as alleged in subparts c), d) and e) is plainly based on the officer's discretion. As such, the officer would be shielded from liability under the Tort Immunity Act, and because the officer is immune, the City is also immune. 745 ILCS 10/2-109 (2007); *see also Zinnermon v. City*, 209 F. Supp.2d at 911 (N.D. Ill 2002),

Finally, although Plaintiff states throughout Count III that the officers' acts were "willful and wanton," the City is still immune. In *In re Chicago Flood Litigation*, the Illinois Supreme Court held there is no exception for willful and wanton conduct in the Tort Immunity Act. 176 Ill.2d. 179, 196 (Ill. 1997). Although the Court in the case cited above, *Reed v. City of Chicago*, found that the alleged willful and wanton conduct lies outside of the scope of statutory immunity, Judge Moran later held that the willful and wanton exception carved out by courts in this circuit was in conflict with the Illinois Supreme Court's holding in *In re Flood. Zinnermon*, 209 F. Supp.at 911 ("we are

bound to follow the highest state court's reading of the state statutes"). Other courts in this circuit have followed this holding. *See also Hartman*, 158 F.Supp at 877, *Eruteya v. City*, 2005 WL 563213 at 7.

## V.    Conclusion

The vast majority of the specific allegations brought in Count III of Plaintiff's complaint, in particular those described in  paragraph 41, subsections  b) c), d), e), f), and h) through (q), are based on the City's polices or on discretionary acts of its employees.  However, pursuant to the Illinois Tort Immunity Act, the City is immune from these claims, and they must be dismissed pursuant to Federal Rule 12(b)(6).

WHEREFORE, because the City is immune pursuant to the Illinois Tort Immunity Act to many of the claims brought in Counts III and IV of Plaintiff's complaint, the City respectfully moves this honorable Court to dismiss those claims.

Respectfully submitted,

MARA S. GEORGES
Corporation Counsel of the City of Chicago

By:    **/s/ *Megan K. McGrath***
Megan K. McGrath
Assistant Corporation Counsel

30 North LaSalle Street, Suite 1020
Chicago, Illinois  60602
(312) 744-8369
Attorney No. 06288408

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JANELL SALGADO, Administrator of the Estate of VICTOR ANGEL FLORES, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **Case No.** **Plaintiff demands trial by Jury** |
| JOHN, JAMES and MARY DOE, individually and as agents/employees of CITY OF CHICAGO, and CITY OF CHICAGO, a municipal corporation; | ) ) ) ) ) | FILED: MAY16, 2008 08 cv 2878   JH JUDGE GOTTSCHALL MAGISTRATE JUDGE MASON |
| Defendants, | ) ) | |

### COMPLAINT

Plaintiff, JANELL SALGADO, Administrator of the estate of VICTOR ANGEL

FLORES, deceased, by her attorneys, BAAL & O'CONNOR, files this complaint against

Defendants, JOHN, JAMES, and MARY DOE, individually, and as agents and/or employees of

CITY OF CHICAGO; and CITY OF CHICAGO

### JURISDICTION AND VENUE

Plaintiff brings this action, in part, for violations of Decedent's constitutional rights;

therefore, this Court has jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343.  This

Court also has jurisdiction of Plaintiff's related State law claims pursuant to 28 U.S.C. §1367.

Plaintiff's claims arose in Cook County, Illinois and Defendants reside in Cook County,

therefore, venue in this Court is proper under 28 U.S.C. §1391.

DEFENDANT'S EXHIBIT
A

### UNDERLYING FACTS

1.      CITY OF CHICAGO is a municipal corporation residing in Cook County,

Illinois.

2.      At all times on and before June 28, 2007, CITY OF CHICAGO operated,

controlled and maintained a police department, known as the CHICAGO POLICE

DEPARTMENT (hereinafter CPD).

3.      On and prior to June 28, 2007, JOHN, JAMES and MARY DOE were police

and/or law enforcement officers employed by the CITY OF CHICAGO

4.      Prior to June 28, 2007, VICTOR ANGEL FLORES (hereinafter VICTOR) was

diagnosed with, and/or was being treated for, bipolar disorder and/or other similar serious mental

health condition.

5.      At some point prior to June 28, 2007, CPD issued an arrest warrant for VICTOR.

6.      On June 28, 2007, CPD, including JOHN and JAMES DOE, arrived at 1212

South 50th Avenue, Cicero, IL, to arrest VICTOR.

7.      Prior to arriving at 1212 South 50th Avenue, CPD issued an alert to all its officers,

including JAMES, JOHN and MARY DOE, that VICTOR was suicidal and/or had a serious

mental health condition.

8.      In the alternative to Paragraph 7, CPD officers, including JOHN, JAMES, and

MARY DOE received notice from another law enforcement agency that VICTOR was suicidal

and/or had a serious mental health condition.

9.      When CPD arrived at that residence, VICTOR was either standing on the roof of

that residence or standing on the roof of a nearby house, and he was telling CPD officers,

including JOHN and JAMES DOE, that he was suicidal and/or was going to harm himself.

10.     At that same time and place, various family members and friends of VICTOR told CPD, including JOHN and JAMES DOE, that VICTOR had bipolar disorder and/or similar serious mental health condition, and/or told CPD, including JOHN and JAMES DOE, that VICTOR was suicidal.

11.     As a result of VICTOR'S suicidal threats and/or serious mental health condition, the Cicero Fire Department and/or other various paramedics arrived at 1212 South 50th Avenue.

12.     At some point on June 28, 2007, VICTOR surrendered to CPD at or near 1212 South 50th Avenue.

13.     As part of its police department, CPD owns, controls, maintains and operates various police stations, including the police station on 3151 W. Harrison Street in Chicago, Illinois.

14.     After VICTOR surrendered to CPD, CPD, including JOHN and JAMES DOE, while acting under color of law, handcuffed VICTOR and placed him in a CPD squad car and transported him to the police station on 3151 W. Harrison Street in Chicago, Illinois (hereinafter Station).

15.     MARY DOE works at the police station on 3151 W. Harrison Street, and was involved in the "booking", "screening", "intake", and admission of VICTOR, and was also involved in the placement or confinement of VICTOR within the station.

16.     Upon VICTOR'S arrival at the Station, MARY was told, by either JOHN or JAMES DOE or other CPD officer/employee or by VICTOR or otherwise learned, that VICTOR was suicidal and had other serious mental health condition.

17.     VICTOR died while at the Police Station.

18.     From the time he surrendered to CPD (at or near 1212 South 50th Avenue) until the time of his death, CPD had sole and complete custody and control of VICTOR.

19.     Plaintiff, JANELL SALGADO, is VICTOR'S mother and on May 15, 2008 was appointed (by Circuit Court of Cook County) Administrator of his estate.

20.     VICTOR is the natural father of JANELL FLORES and may be the natural father of XOCHITZ MARIA FLORES.

## COUNT I---1983 CLAIM AGAINST JOHN, JAMES & MARY DOE

21.     Plaintiff restates paragraphs 1 through 20 as Paragraph 21 of Count I.

22.     JOHN, JAMES & MARY DOE had a duty to take reasonable steps to protect decedent from harm, including protecting decedent from harming himself, when defendants knew of a substantial risk of harm to decedent, including the risk that decedent may harm himself.

23.     JOHN, JAMES & MARY DOE had a duty to provide to decedent, and/or ensure that decedent received, adequate medical care, including mental health care and treatment.

24.     JOHN, JAMES & MARY DOE had a duty to not use force that was objectively unreasonable in light of the facts and circumstances confronting them.

25.     JOHN, JAMES & MARY DOE had a duty to not inflict severe and outrageous bodily harm on decedent;

26.     In violation of its duties, JOHN, JAMES & MARY DOE, while acting under color of law and with deliberate indifference, committed one or more of the following wrongful acts or omissions:

> a)     Failed to remove all items, such as belts, drawstrings, laces, articles of clothing or similar items from decedent's person/possession, when defendant knew these items could be used to harm oneself and when defendants knew that decedent was at a substantial risk of harming himself;

b)      Placed decedent in a jail cell/detention area in which there were strings, laces, belts, fixtures, articles of clothing, bed sheets, towels or similar items when defendants knew these items could be used to harm oneself and when defendants knew that decedent was at a substantial risk of harming himself;

c)      Placed decedent in a cell/detention area inside of the Station instead of bringing him to a hospital or other medical facility, including mental health facility (or in the alternative, failed to notify appropriate CPD personnel and/or health care providers and/or social workers and/or crisis workers about decedents' condition) when defendants knew decedent was at a substantial risk of harming himself and/or knew decedent needed medical treatment, including mental health treatment, and knew that there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment;

d)      Failed to place decedent in a cell/detention area where he would receive adequate supervision/monitoring when defendants knew decedent was at a substantial risk of harming himself and when defendants knew decedent required adequate supervision/monitoring

e)      Failed to adequately monitor and supervise decedent when defendants knew decedent was at a substantial risk of harming himself and when defendants knew decedent required adequate supervision/monitoring

f)      Placed decedent in a cell with another arrestee/pretrial detainee, which aggravated decedents' poor mental health and/or suicidal condition, when defendants knew placing decedent with another arrestee/pretrial detainee would aggravate his mental health and/or suicidal condition and when defendants knew decedent was at a substantial risk of harming himself;

g)      Failed to ensure that decedent receive, and/or timely receive, a mental health screening or equivalent assessment when defendants knew decedent was at a substantial risk of harming himself and knew that decedent needed medical, including mental health, treatment, and knew there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment;

h)      Used excessive force (namely, punched, choked, struck, kicked, suffocated and otherwise beat) against decedent that was objectively unreasonable in light of the facts and circumstances confronting defendants and when such force created a substantial risk of serious harm to decedent;

i)      Inflicted severe and outrageous bodily harm on decedent; namely, punched, choked, struck, kicked, suffocated and otherwise beat decedent;

j)      Failed to follow CPD policies and procedures and internal guidelines regarding care and treatment of arrestees, such as decedent, who needed medical, including mental

health treatment, and/or failed to follow CPD policies and procedures and internal guidelines regarding care and treatment of arrestees who are suicide risks and/or at a substantial risk of harming themselves, when defendants knew there was a substantial risk that decedent would harm himself and/or knew decedent needed medical treatment, including mental health treatment, and knew that there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment;

k)    Failed to follow CPD polices and procedures and internal guidelines regarding the use of force against arrestees, such as decedent, who needed medical, including mental health, treatment, and failed to follow CPD policies and procedures and internal guidelines regarding the use of force against arrestees, such as decedent, who were at a substantial risk of harming themselves, when defendants knew decedent was at a substantial risk of harming himself and/or knew decedent needed medical treatment, including mental health treatment, and knew that there was a substantial risk of serious harm to decedent if force (that was objectively unreasonable in light of the facts and circumstances confronting the officers/employees) was used against him;

27.    As a proximate result of one or more of these wrongful acts or omissions, which were done with deliberate indifference and were done while acting under color of law, on June 28, 2007, decedent, VICTOR ANGEL FLORES, either committed suicide or died as a result of inadequate medical care, including mental health care and treatment, or died as a result of injuries inflicted by CPD, including JAMES, JOHN & MARY DOE, and thus, VICTOR was deprived of rights and privileges guaranteed by the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution.

28.    Between the time he was arrested at 1212 South 50th Avenue and the time of his death, decedent VICTOR ANGEL FLORES incurred substantial non-economic damages, including pain, suffering, humiliation, and emotional and mental distress.

29.    As a proximate result of the wrongful death of VICTOR ANGEL FLORES, his estate has incurred medical and funeral expenses. Plaintiff makes a claim against Defendants for reimbursement of these expenses under the rule in *Saunders v. Schultz*, 20 Ill.2d 301.

30.    As a proximate result of the wrongful death of VICTOR ANGEL FLORES, each of his heirs has sustained a substantial pecuniary loss, including the loss of the love, society and companionship of VICTOR.

WHEREFORE, Plaintiff, JANELL SALGADO, Administrator of the estate of VICTOR ANGEL FLORES, deceased, demands judgment against Defendants, JOHN, JAMES and MARY DOE, in an amount in excess of $100,000, plus costs and attorneys fees as provided by the Civil Rights Act and other Federal Statutes.

## COUNT II---SECTION 1983 CLAIM AGAINST CITY OF CHICAGO

31.    Plaintiff restates Paragraphs 1 through 30 as Paragraph 31 of Count II.

32.    CITY OF CHICAGO, through CPD, had a duty to take reasonable steps to protect its arrestees/pretrial detainees, such as decedent, including protecting these arrestees/pretrial detainees from harming themselves, when defendant knew of a substantial risk of harm to these arrestees, including the risk that these arrestees, such as decedent, may harm themselves.

33.    CITY OF CHICAGO had a duty to provide to its arrestees/pretrial detainees, including decedent, adequate medical care, including mental health care and treatment.

34.    CITY OF CHICAGO had a duty to ensure that its officers and law enforcement officers did not use force that was objectively unreasonable in light of the facts and circumstances confronting those officers.

35.    In violation of its duties, CITY OF CHICAGO, through CPD, committed, with deliberate indifference and while acting under color of law, one or more of the following wrongful acts or omissions:

(a)    Had a custom and practice in which arrestees/pretrial detainees, such as decedent, whom defendant knew had serious mental health conditions, did not receive, and/or did not timely receive, a mental health screening or equivalent assessment to determine suicide risk, when defendants knew these arrestees, such as decedent, were much more

likely to harm, or try to harm, themselves than the rest of the Jail population, and when defendants knew that other arrestees had harmed, or tried to harm, themselves at CPD police stations, and when defendants knew that this custom and practice substantially increased the risk that these arrestees, such as decedent, would harm themselves;

(b)    Had a custom and practice in which arrestees/pretrial detainees with known serious mental health or objectively serious medical conditions and/or known suicidal ideations, such as decedent, were taken to a police station rather than a hospital or other health care provider, when defendants knew there was a substantial risk that the arrestee, . such as decedent, would harm himself if not receiving such mental health treatment and/or there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment, and where defendants knew that other arrestees had either harmed themselves, or tried to harm themselves, and/or sustained serious injuries, as a result of not receiving such mental health or medical treatment; and where defendants knew that this custom and practice substantially increased the risk that the arrestees, such as decedent, would harm himself and/or sustain serious injury;

(c)    Had a custom and practice in which it did not require that all items such as belts, drawstrings, laces, articles of clothing or similar items be removed from an arrestee's/pretrial detainees', such as decedent, person/possession when defendants knew there was a substantial risk that these arrestees, such as decedent, would use these items to harm themselves and when other arrestees had used these items to harm, or try to harm, themselves and when defendants knew that this custom and practice increased the risk that pretrial detainees, such as decedent, would harm himself.

(d)    Had a custom and practice in which arrestees/pretrial detainees with known serious mental health conditions, such as decedent, were placed in cells/detention areas where there were strings, laces, belts, fixtures, articles of clothing, bed sheets, towels or similar items that arrestees, such as decedent, could use to harm oneself, when defendants knew that these arrestees, such as decedent, were at a substantial risk of harming themselves, and where other arrestees had used these items to harm, or try to harm, themselves, and where defendants knew that this custom and practice increased the risk that pretrial detainees, such as decedent, would harm himself

(e)    Had a custom and practice in which its officers were not required to report suicide threats made by arrestees/pretrial detainees and/or were not required to report other objectively serious medical or mental health conditions of its arrestees to medical care providers, crisis workers or social workers or other appropriate CPD personnel when defendants knew there was a substantial risk that the arrestees, such as decedent, would harm themselves if not receiving such mental health treatment and/or there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment, and where other inmates had harmed, or tried to harm, themselves after making suicide threats that were unreported and/or sustained other serious injuries as a result of their objectively serious medical/mental health conditions being unreported, and where defendants knew that this custom and practice increased the risk that the arrestees, such as decedent, would harm himself and/or sustain serious injury;

(f)     Had a custom and practice in which it did not place arrestees with known mental health conditions and/or who were suicide risks, such as decedent, in cells/area of the jail with a higher degree of supervision/monitoring, when knew these arrestees, such as decedent, were at a substantial risk of harming himself, and when defendants knew that other arrestees had harmed, or tried to harm, themselves while in areas without proper supervision and when defendants knew that this practice substantially increased the risk that arrestees, such as decedent, would harm themselves;

(g)     Failed to train its officers in suicide prevention and suicide awareness when defendant knew these arrestees/pretrial detainees, such as decedent, were much more likely to commit, or try to commit, suicide than the general jail population, and when defendants knew that arrestees had committed, or tried to commit, suicide at its police stations, and when defendants knew that this practice substantially increased the risk that the arrestees, such as decedent, would harm themselves; and when defendants knew its officers lacked the proper training to adequately prevent suicide and/or adequately recognize arrestees, such as decedent, who were at substantial risk of suicide;

(h)     Failed to ensure that its officers did not use excessive force against arrestees/pretrial detainees who had known serious mental health conditions and/or were suicide risks, when this degree of force was objectively unreasonable in light of the facts and circumstances confronting the officers, and when arrestees, such as decedent, were more likely to commit, or try to commit, suicide when subjected to this excessive force, and when other inmates with known serious mental health issues and/or suicide risks had committed, or tried to commit, suicide after being subjected to excessive force, and when defendants knew that this practice substantially increased the risk that arrestees, such as decedent, would harm themselves;

(i)     Failed to ensure that its officers and employees follow CPD's own policies and procedure regarding care and treatment of arrestees/pretrial detainees with mental health conditions and/or who were suicide risks and/or required emergent medical treatment, when defendants knew its policies and procedures were not being followed and when arrestees/pretrial detainees had harmed themselves, or tried to harm themselves, and/or sustained other serious injuries as a result of these policies and procedures not being followed and when defendant knew there was a substantial risk that arrestees, such as decedent, would harm himself and/or otherwise sustain serious injuries if these policies and procedures were not followed;

36.     As a proximate result of one or more of these wrongful acts or omissions, which were done with deliberate indifference and were done while acting under color of law, on June 28, 2007, decedent, VICTOR ANGEL FLORES, either committed suicide or died as a result of inadequate medical care, including mental health care and treatment, or died as a result of

injuries inflicted by CPD, and thus, VICTOR was deprived of rights and privileges guaranteed by the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution.

37.    Plaintiff restates Paragraphs 28 through 30 as Paragraph 37 of Count II.

WHEREFORE, Plaintiff, JANELL SALGADO, Administrator of the estate of VICTOR ANGEL FLORES, deceased, demands judgment against Defendant, CITY OF CHICAGO, in an amount in excess of $100,000, plus costs and attorneys fees as provided by the Civil Rights Act and other Federal Statutes.

## COUNT III---SURVICAL ACTION AGAINST CITY OF CHICAGO

38.    Plaintiff restates Paragraphs 1 through 37 as Paragraph 38 of Count III.

39.    CITY OF CHICAGO, through CPD, including JOHN, JAMES, and MARY DOE, had a duty to exercise ordinary care for those who have been arrested and incarcerated, such as decedent, and had a duty to use ordinary and reasonable care for the preservation of the arrestee's, including decedent, health and life under the circumstances of the particular case.

40.    CITY OF CHICAGO, through CPD, including JOHN, JAMES, and MARY DOE, had a duty to not use, against decedent, force that was objectively unreasonable in light of the facts and circumstances confronting them and/or had a duty to not inflict severe and outrageous bodily harm on decedent.

41.    In violation of these duties, Defendant CITY OF CHICAGO, through CPD and its other agents and employees, including JOHN, JAMES, and MARY, committed, in the course and scope of their employment and in a willful and wanton manner, one or more of the following acts or omissions:

a)    Failed to remove all items, such as belts, drawstrings, laces, articles of clothing or similar items from decedent's person/possession, when defendants knew these items could be used to harm oneself and when defendants knew that decedent was at a substantial risk of harming himself;

b)      Placed decedent in a jail cell/detention area in which there were strings, laces, belts, fixtures, articles of clothing, bed sheets, towels or similar items that defendant knew decedent could use to harm himself and when defendants knew that decedent was at a substantial risk of harming himself;

c)      Placed decedent in a cell/detention area inside of the Station instead of bringing him to a hospital or other medical facility, including mental health facility (or in the alternative, failed to notify appropriate CPD personnel and/or health care providers and/or social workers and/or crisis workers about decedents' condition) when defendants knew decedent was at a substantial risk of harming himself and/or knew decedent needed medical treatment, including mental health treatment, and knew that there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment;

d)      Placed decedent in a cell/detention area where there was no CPD personnel, crisis counsels or other Police Station employees/agents who could respond to decedents requests or complaints, when defendants knew that decedent was at a substantial risk of harming himself and/or knew that decedent had an objectively serious medical/mental health condition and knew decedent needed immediate medical treatment, including mental health treatment, and knew there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment;

e)      Placed decedent in a cell with another arrestee/pretrial detainee, which aggravated decedents' poor mental health and/or suicidal condition, when defendants knew placing decedent with another arrestee/pretrial detainee would aggravate his mental health and/or suicidal condition and when defendants knew decedent was at a substantial risk of harming himself;

f)      Failed to ensure that decedent receive, and/or timely receive, a mental health screening or equivalent assessment when defendants knew decedent was at a substantial risk of harming himself and knew that decedent needed medical, including mental health, treatment, and knew there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment;

g)      Used excessive force (namely, punched, choked, struck, kicked, suffocated and otherwise beat) against decedent that was objectively unreasonable in light of the facts and circumstances confronting defendants and when such force created a substantial risk of serious harm to decedent, and/or defendants otherwise inflicted severe and outrageous bodily harm on decedent;

h)      Failed to follow CPD policies and procedures and internal guidelines regarding care and treatment of arrestees, such as decedent, who needed medical, including mental health treatment, and/or failed to follow CPD policies and procedures and internal guidelines regarding care and treatment of arrestees who are suicide risks and/or at a substantial risk of harming themselves, when defendants knew there was a substantial

risk that decedent would harm himself and/or knew decedent needed medical treatment, including mental health treatment, and knew that there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment;

i)      Failed to follow CPD polices and procedures and internal guidelines regarding the use of force against arrestees, such as decedent, who needed medical, including mental health, treatment, and failed to follow CPD policies and procedures and internal guidelines regarding the use of force against arrestees, such as decedent, who were at a substantial risk of harming themselves, when defendants knew decedent was at a substantial risk of harming himself and/or knew decedent needed medical treatment, including mental health treatment, and knew that there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment;

(j)      Had a custom and practice in which arrestees/pretrial detainees, such as decedent, whom defendant knew had serious mental health conditions, did not receive, and/or did not timely receive, a mental health screening or equivalent assessment to determine suicide risk, when defendants knew these arrestees, such as decedent, were much more likely to harm, or try to harm, themselves than the rest of the Jail population, and when defendants knew that other arrestees had harmed, or tried to harm, themselves at CPD police stations, and when defendants knew that this custom and practice substantially increased the risk that these arrestees, such as decedent, would harm themselves;

(k)      Had a custom and practice in which arrestees/pretrial detainees with known serious mental health or objectively serious medical conditions and/or known suicidal ideations, such as decedent, were taken to a police station rather than a hospital or other health care provider, when defendants knew there was a substantial risk that the arrestee, such as decedent, would harm himself if not receiving such mental health treatment and/or there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment, and where defendants knew that other arrestees had either harmed themselves, or tried to harm themselves, and/or sustained serious injuries, as a result of not receiving such mental health or medical treatment; and where defendants knew that this custom and practice substantially increased the risk that the arrestees, such as decedent, would harm himself and/or sustain serious injury;

(l)      Had a custom and practice in which it did not require that all items such as belts, drawstrings, laces, articles of clothing or similar items be removed from an arrestee's/pretrial detainees', such as decedent, person/possession when defendants knew there was a substantial risk that these arrestees, such as decedent, would use these items to harm themselves and when other arrestees had used these items to harm, or try to harm, themselves and when defendants knew that this custom and practice increased the risk that pretrial detainees, such as decedent, would harm himself.

(m)      Had a custom and practice in which arrestees/pretrial detainees with known serious mental health conditions, such as decedent, were placed in cells/detention areas where there were strings, laces, belts, fixtures, articles of clothing, bed sheets, towels or similar items that arrestees, such as decedent, could use to harm oneself, when defendants

knew that these arrestees, such as decedent, were at a substantial risk of harming themselves, and where other arrestees had used these items to harm, or try to harm, themselves, and where defendants knew that this custom and practice increased the risk that pretrial detainees, such as decedent, would harm himself

(n)    Had a custom and practice in which its officers were not required to report suicide threats made by arrestees/pretrial detainees and/or were not required to report other objectively serious medical or mental health conditions of its arrestees to medical care providers, crisis workers or social workers or other appropriate CPD personnel when defendants knew there was a substantial risk that the arrestees, such as decedent, would harm themselves if not receiving such mental health treatment and/or there was a substantial risk of serious harm to decedent if he did not receive such medical/mental health treatment, and where other inmates had harmed, or tried to harm, themselves after making suicide threats that were unreported and/or sustained other serious injuries as a result of their objectively serious medical/mental health conditions being unreported, and where defendants knew that this custom and practice increased the risk that the arrestees, such as decedent, would harm himself and/or sustain serious injury;

(o)    Failed to train its officers in suicide prevention and suicide awareness when defendant knew these arrestees/pretrial detainees, such as decedent, were much more likely to commit, or try to commit, suicide than the general jail population, and when defendants knew that arrestees had committed, or tried to commit, suicide at its police stations, and when defendants knew that this practice substantially increased the risk that the arrestees, such as decedent, would harm themselves; and when defendants knew its officers lacked the proper training to adequately prevent suicide and/or adequately recognize arrestees, such as decedent, who were at substantial risk of suicide;

(p)    Failed to ensure that its officers did not use excessive force against arrestees/pretrial detainees who had known serious mental health conditions and/or were suicide risks, when this degree of force was objectively unreasonable in light of the facts and circumstances confronting the officers, and when arrestees, such as decedent, were more likely to commit, or try to commit, suicide when subjected to this excessive force, and when other inmates with known serious mental health issues and/or suicide risks had committed, or tried to commit, suicide after being subjected to excessive force, and when defendants knew that this practice substantially increased the risk that arrestees, such as decedent, would harm themselves;

(q)    Failed to ensure that its officers and employees follow CPD's own policies and procedure regarding care and treatment of arrestees/pretrial detainees with mental health conditions and/or who were suicide risks and/or required emergent medical treatment, when defendants knew its policies and procedures were not being followed and when arrestees/pretrial detainees had harmed themselves, or tried to harm themselves, and/or sustained other serious injuries as a result of these policies and procedures not being followed and when defendant knew there was a substantial risk that arrestees, such as decedent, would harm himself and/or otherwise sustain serious injuries if these policies and procedures were not followed;

13

42.     As a proximate result of one or more of these wrongful acts or omissions, which were done in a willful and wanton manner and were done in the course and scope of employment, on June 28, 2007, decedent, VICTOR ANGEL FLORES, either committed suicide or died as a result of inadequate medical care, including mental health care and treatment, or died as a result of injuries inflicted by CPD, and thus, VICTOR was deprived of rights and privileges guaranteed by the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution.

43.     Defendant CITY OF CHICAGO, through CPD, is liable for the willful and wanton acts and omissions of its employees and agents, including JOHN, JAMES and MARY DOE, pursuant to the doctrine of Respondeat Superior.

44.     Plaintiff restates Paragraphs 28 through 30 as Paragraph 44 of Count III.

45.     Count III of Plaintiff's complaint is brought under the Illinois Survival Act (755 ILCS 5/27-6).

WHEREFORE, Plaintiff, JANELL SALGADO, Administrator of the estate of VICTOR ANGEL FLORES, deceased, demands judgment against Defendant, CITY OF CHICAGO, in an amount in excess of $100,000, plus costs of suit.

## COUNT IV--- WRONGFUL DEATH ACTION AGAINST CITY OF CHICAGO

46.     Plaintiff restates Paragraphs 1 through 45, and specifically, Paragraphs 39 through 44 as Paragraph 46 of Count IV.

47.     Count IV of Plaintiff's complaint is brought under the Illinois Wrongful Death Act (740 ILCS 180/1, et seq.).

WHEREFORE, Plaintiff, JANELL SALGADO, Administrator of the estate of VICTOR ANGEL FLORES, deceased, demands judgment against Defendant, CITY OF CHICAGO, in an amount in excess of $100,000, plus costs of suit.

s/Bryan J. O'Connor Jr.
BRYAN J. O'CONNOR JR.
"Lead Counsel" for Plaintiff